# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.1:11CR91 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION & ORDER |
| | ) | |
| JOSE MIGUEL CARDENAS, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Defendant Jose Miguel Cardenas moves to suppress all evidence obtained during searches of his leased residence on September 8, 2010 and September 17, 2010. He also seeks to suppress any and all statements he may have made to law enforcement personnel during the September 8, 2010 search. (Doc. No. 483.) In support of his motion, defendant Cardenas maintains that: (1) he was arrested without probable cause; (2) the September 8, 2010 search was unreasonable as the defendant was subjected to excessive force; (3) officers violated the "Knock and Announce" rule; (4) the leaseholder of his residence could not have consented to the September 17, 2010 search; and (5) items seized from the residence exceeded the scope of the September 8, 2010 search warrant. The government opposes the motion. (Doc. No. 509.) On September 19, 2011, the Court conducted an evidentiary hearing on the motion. For the reasons to follow, the defendant's motion is DENIED.

**Background**

*Stipulated Facts*

The parties entered into a stipulation as to undisputed facts. (Doc. No. 520.) The parties agree that, on September 8, 2010, federal investigators executed a search warrant at 6189 Cambridge Park Drive in Mentor, Ohio. At approximately, 6:00 am on that date, Special Agent Kirk Johns and Task Force Officer Michael Gardner arrived at the residence and established surveillance. At approximately 10:00 am, Johns and Gardner observed a Jetta, occupied by two individuals, exit the garage of the residence. The Jetta made several stops, including a Subaru dealership, a YMCA, and a gas station. *Id.*

A search warrant was signed at 10:30 am for the residence, but no arrest warrant was ever procured for any of the residents. (*See* Gov. Ex. 1.) At approximately, 12:14 pm, the Jetta and its occupants returned to the residence. No more than fifteen minutes earlier, a search team of 12-15 members had arrived in the area. At approximately 12:15 pm, the search team made entry into the residence. Once inside the residence, members of the search team encountered the defendant and co-defendant Carols Felix. Both individuals were handcuffed. Officers administered verbal *Miranda* warnings to the defendant, and Special Agent Moses began an interview of the defendant. The search was completed at approximately 1:45 pm. Before the search was completed, local detectives transported the defendant to a local police department to be fingerprinted and photographed. Officers retained the defendant's Legal Permanent Residence Card, and said card is still in the government's possession. *Id.*

A second search of the residence occurred on September 17, 2010. The

2

owner of the residence gave law enforcement written consent for the search. (*See* Gov. Ex. 4.) Several items were removed from the residence and the garage during this second search. *Id.*

 *Disputed Facts*

The Government's Version

 Special Agent Sean Moses of the DEA testified that the facts relevant to the present motion to suppress began to unfold hours before the defendant's residence was first searched. In the early morning hours of September 8, 2010, Moses, the lead agent, and other agents from various agencies executed a series of search warrants in Ashtabula, Ohio as part of a drug conspiracy investigation. Of the residences searched were those of co-conspirators Shawn Decola, Chris Dyer and William Saad Bradley. Significant amounts of cocaine and crack cocaine, as well as loaded firearms, were recovered from all three residences.

 As part of the agents' operation plan, two officers were assigned to monitor the activities of the defendant and Felix on the morning of September 8, 2010 inasmuch as the defendant and Felix had recently been observed via physical and video surveillance at Decola's residence engaging in what investigators believed to be drug

activity.[1] In addition, Special Agent Moses testified that he wanted to make sure that the defendant and Felix were not aware that searches were taking place at that time in Ashtabula, Ohio. There was a concern, Moses testified, that if the defendant and Felix became aware of the activity in Ashtabula, they may flee the area or destroy evidence.

During the search of Decola's residence, Decola provided agents with information which confirmed that the defendant and Felix were members of the drug conspiracy. Specifically, Decola told agents that the suspicious activity that agents had previously observed was, in fact, a delivery of seven kilos of cocaine, and that a large Tide laundry box the defendant had acquired was used by the defendant to transport the proceeds from the sale. It was this information that formed the basis for the search warrant application for the defendant's residence.

While Special Agent Moses was obtaining the search warrant, a search team was being assembled at the Mentor Police Station. Moses arrived at the police station, briefed the members of the search team, and then proceeded with the team to the defendant's residence. The agents arrived at the defendant's residence around 12:00 pm, approximately 15 minutes before the defendant and Felix returned.

Shortly after the defendant and Felix had returned to the residence, Special

---

[1] Special Agent Robert McBride of the FBI testified that he and other agents conducted electronic video and physical surveillance of Decola's residence, and other locations, beginning on May 5, 2010. He further testified that the defendant and Felix were seen on video surveillance visiting Decola's residence on August 26, 2010, and visual surveillance revealed them returning to the residence on September 3, 2010. (Gov. Ex. 8A-8D, surveillance photographs of August 26, 2010.) The two men returned again on September 5, 2010. (Gov. Ex. 9A-9D, surveillance photographs of September 5, 2010.) Special Agent McBride testified that on that date (September 5, 2010), video surveillance showed the defendant entering and leaving the residence with a large Tide laundry box.

4

Agent Moses knocked on the front door and announced loudly that the police had a search warrant to search the premises. He testified that he stood on the front porch waiting "for what seemed like a long time" while other members of his team gathered what tools would be needed for the search. Moses indicated that he was concerned because, while he waited for a response from the occupants of the residence and for his team to join him on the porch, he was standing in front of a large picture window without any cover or concealment.

After receiving no response, and aware that prior searches that morning had yielded drugs and loaded weapons, Moses led the search team into the residence through the unlocked front door with guns drawn. The occupants (the defendant and Felix) were encountered inside the residence,[2] were instructed to lie on the ground, and were handcuffed. Once the residence was secured, the defendant and Felix were allowed to get up and sit in chairs. The members of the search team also holstered their weapons, following the initial sweep of the premises.

After Special Agent Moses ascertained that the defendant understood English, he explained to the defendant his *Miranda* rights, and then informed him of the search warrant. The defendant was also provided a copy of the warrant. When the defendant later inquired as to what the agents were looking for, Special Agent Moses indicated "a large Tide detergent box." The defendant advised Moses where the box could be located, and it was, indeed, located there. Approximately $113,000 in U.S. currency was found in the box.

---

[2] Special Agent Moses testified that the defendant was located in the living room, standing in front of the door Moses entered, and Felix was found in a sitting room.

The search resulted in the recovery of the aforementioned Tide box and its currency, an additional $4,500 in U.S. currency, a Blackberry, and six other cellular phones. Though not mentioned in the search warrant, agents also seized certain articles of clothing, as well as items thought to be used in the packaging and distribution of drugs, including a food saver machine and a box of food saver bags. (Gov. Ex. 3, Return of Search of September 8, 2010.)

At some point during the search, the defendant complained that his handcuffs were too tight, and they were loosened at his request. He was also permitted to remain seated during the 90 minute search. Special Agent Moses testified that another agent, who was assigned to obtain biographical information from the defendant, presented the defendant with a written constitutional rights waiver form. Upon review of the form, the defendant invoked his right to counsel and refused to answer any more questions.

Prior to the end of the search, the defendant and Felix were transported separately to the Wickliffe Police Department for fingerprinting and photographing. Special Agent Moses testified that Felix was wanted on an outstanding traffic warrant in Wickliffe. He asked the Wickliffe police if they would, while processing Felix, also photograph and fingerprint the defendant. The officers agreed, and Sergeant Brad Kemp and Special Agent Brian Dombek transported the defendant to the Wickliffe Police Station. Moses explained that he wanted the defendant photographed and fingerprinted in the event that the defendant fled the area. Further, it was his understanding that the defendant was not questioned by police during the transport or any time thereafter. After he was fingerprinted and photographed, the defendant was returned to his residence

where he was "free to go."³

Special Agent Robert McBride of the FBI testified that, on September 16, 2010, he contacted Dana Toro, the owner of the 6189 Cambridge Park Drive property. In a telephone conversation, Toro told McBride that he had spoken with the defendant by phone on the night of the September 8, 2010 search. The defendant advised Toro that he was leaving town to join family in California. While Toro was still speaking with the defendant, a taxi cab arrived at the 6189 Cambridge Park Drive residence, and the defendant left for the airport in the cab. Mr. Toro further advised Special Agent McBride that the defendant contacted him telephonically on September 16, 2010, indicating that he was planning to remain in California and would not be returning to Ohio. According to Mr. Toro, the "caller id" on his phone indicated that the call had been placed in Gardenia,

---

[3] Special Agent Moses testified that there was never any plan to arrest the defendant, or occupants of any of the residences searched, on the day of the September 8, 2010 searches. He explained that the defendant was believed to be part of a larger conspiracy and the government was not yet prepared to seek indictments against all members of the conspiracy.

California. The defendant asked Toro if he could mail him his belongings, but Toro refused and told the defendant that his things would be moved to the curb. Based on his conversation with Toro, wherein Toro recounted his conversations with the defendant, Special Agent McBride testified that he believed that the defendant had abandoned the property.

On September 17, 2010, Special Agents McBride and Moses met Toro at the 6189 Cambridge Park Drive residence. Mr. Toro signed a written consent form for a search of the premises. (Gov. Ex. 4, consent to search form.) During the search, Toro pointed out to the agents items left on the property that did not belong to him. Numerous items were confiscated during the search. (Gov. Ex. 7, DEA 6 report detailing the items taken during the September 17, 2010 search.) Before the agents left the premises, Toro produced a copy of the rental application and the rental agreement (Gov. Ex. 5, 502 Form, attachments.) The lease agreement, which was signed September 1, 2010, provided for a lease term of September 1, 2010 through August 31, 2011.

### The Defendant's Version

It is not surprising that the defendant, who did not testify at the evidentiary hearing, offered a somewhat different story in his motion. After waiting around "60 seconds" for the defendant to respond to their request for entry, the defendant claims that agents forced their way into his residence. Upon entry, agents found the defendant and Felix in the garage. According to the defendant, agents threw them to the ground, handcuffed them, and told them that they were under arrest. The defendant claims that he was forcibly photographed while in handcuffs, and was not permitted to use the bathroom. During the search, agents seized numerous items, including clothing.

**Governing Law**

The Fourth Amendment protects against "unreasonable searches and seizures." The controlling standard of the Fourth Amendment is reasonableness. *See Katz v. United States*, 389 U.S. 347, 357 (1967). An individual is seized, for purposes of the Fourth Amendment, "whenever a police officer accosts an individual and restrains his freedom to walk away […]." *Terry v. Ohio*, 392 U.S. 1, 16. It is undisputed that the defendant was detained (and restrained by means of handcuffs) during the 90 minute search that took place on September 8, 2010 at his residence.

<u>The Defendant was not Illegally Arrested</u>

The defendant maintains that he was illegally arrested without probable cause, and detained in violation of the Fourth Amendment. He insists that officers "targeted [him] without any reasonable suspicion that he had committed any crime or was about to commit any crime." (Mot. at 7.) He further complains that officers waited until he returned to his residence to execute the search warrant, thereby manipulating the circumstances in order to justify his arrest. Neither the facts, nor the law, support his position that the manner in which the searches of September 8, 2010 and September 17, 2010 were performed justifies the suppression of the evidence seized therein.

The September 8, 2010 search of his residence followed the issuance of a search warrant, and the defendant does not challenge the legal sufficiency of the warrant. In *Michigan v. Summers*, 452 U.S. 692, 705 (1981), the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." In reaching this conclusion, the Court observed that "some seizures

9

admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as the police have an articuable basis for suspecting criminal activity." *Id*. at 699-700. The Court ultimately concluded that the law enforcement's legitimate interests in "preventing flight in the event that incriminating evidence is found," and "minimizing the risk of harm to the officers" constituted articuable facts that supported the detention of the defendant during the search. *Id* at 702 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.")

The Supreme Court had occasion to revisit the issue in *Muehler v. Mena*, 544 U.S. 93 (2005). There, the defendant, along with other occupants of a residence, was handcuffed for 2 to 3 hours while officers executed a search warrant. Relying on *Summers,* the Court found the detention appropriate. In support of the officers' actions of cuffing the defendants and the other individuals present at the residence, the Court "posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: 'preventing flight in the event that incriminating evidence is found;' minimizing the risk of harm to the officers;' and facilitating the orderly completion of the search, as detainees' self-interest may induce them to open locked doors or locked containers to avoid the use of force.'" *Id*. at 98 (quoting *Summers*, 452 U.S. at 702-03).

Here, Special Agent Moses testified that the need to minimize the risk of harm to the officers and the detainees was the motivating factor in the decision to detain (and restrain) the defendant during the search. He also testified that there was a concern

that the defendant and Felix might flee the area or destroy evidence. While such risks may be inherent in many drug searches, they were of special concern here inasmuch as searches of the residences of alleged co-conspirators mere hours before had yielded guns and weapons, and the agents had information that the defendant and Carlos Felix had also engaged in drug activity. In addition, the "need to detain multiple occupants made the use of handcuffs all the more reasonable." *Muehler*, 544 U.S. at 100.

The defendant suggests that his seizure was unnecessary because the officers deliberately delayed in executing the search warrant until he had returned from his errands. Yet, he concedes that agents had only obtained the warrant shortly before the defendant had returned, and had no legal justification to enter his premises prior to obtaining the warrant.[4] The Court is unaware of any law that dictates that a search warrant must be executed at a time that is most convenient to the owner or occupant of a premises.

Even so, *Summers* expressly recognized that the government's interest "in the orderly completion of the search" is often "facilitated" when "the occupants of premises are present."[5] 452 U.S. at 703. In light of the fact that the warrant allowed for execution "in the daytime 6:00 am to 10:00 pm […] on or before September 21, 2010," officers did nothing improper by executing the warrant after the defendant returned. *See generally, United States v. Cochran*, 939 F.2d 337 (6th Cir. 1991) (agents executing

---

[4] Indeed, the Court finds credible evidence that the agents acted with no undue haste. The warrant was executed within 2 hours of its issuance. The delay between the issuance and execution of the warrant, if it can be argued that there was one, was caused by the need for the search team to assemble, be briefed by the lead agent, and travel to the residence.

[5] Special Agent Moses testified that he preferred to have the residence of a home present during a search so that they could witness what was taken from the home. He explained that this cut down on subsequent bogus claims later that other items were taken during the search.

11

search warrant may require occupant who has departed the premises to be searched to re-enter residence and remain there while the search is conducted); *United States v. Head*, 216 Fed. Appx. 543 (6th Cir. 2007) (officers properly apprehended and detained the defendant during a search of her residence after she had left).

To the extent that the defendant is attempting to challenge the admissibility of any statements he may have made to law enforcement during the search, the Court finds that the defendant was Mirandized before any statements were made. The Court credits the testimony of Special Agent Moses that, after he determined that the defendant spoke English, the agent read him his rights, and the defendant indicated that he understood those rights. Further, the Court finds that, based upon the testimony at the hearing, the defendant initiated the conversation with Special Agent Moses by asking the agents why they were there.[6]

Officers did not Employ Excessive Force

The defendant also complains that he was subjected to excessive force, noting that he was "forced to the ground at gunpoint and an officer placed his knee on Defendant's back and handcuffed him excessively tight." (Mot. at 10.) Special Agents Moses and McBride offered credible and consistent testimony that no officer employed excessive force against either occupant at any time during the search. Further, the record shows that the defendant was permitted to sit in a chair, once the premises was cleared,

---

[6] The Court notes that, after the motion was fully briefed and both sides had rested, counsel for the defendant attempted to insert into the proceedings a question as to the sufficiency of the *Miranda* warnings. The Court does not condone this type of "moving target" motion practice. Nonetheless, the Court finds no reason to believe that the defendant was not properly Mirandized.

and that his handcuffs were loosened upon his request. The Court finds that the credible evidence establishes that there was no excessive force.

However, even assuming that the actual events more closely resemble the defendant's account, such a detention would be far less intrusive than those deemed constitutionally permissible in other cases. *See Muehler*, 544 U.S. at 99-100 (cuffed detention for 2 to 3 hours permissible); *United States v. Fountain*, 2 F.3d 656, 663 (6th Cir. 1993) (upholding *Summers*-type detention where occupants were handcuffed and required to lie face down on floor during execution of warrant). The use of force, therefore, does not require the suppression of evidence seized on September 8, 2010.

The "Knock and Announce" Rule is Inapplicable to these Proceedings

In his motion, the defendant underscored the fact that the officers were aware that the defendant "had *just* pulled into the garage after a full morning of running errands," when they "[a]llegedly waiting one minute, not even 60 seconds, then barging into the home by opening a door with guns drawn, violated the knock and announce rule of 18 U.S.C. 3109." (Mot. at 11.) At the September 19, 2011 hearing, however, counsel for the defendant conceded that a violation of the "knock and announce" rule was not a proper subject for a suppression motion. The Court will, nonetheless, briefly address the issue.

As the Court observed in *Hudson v. Michigan*, 547 U.S. 586, 589 (2006), "[t]he common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one." *See also United States v. Dice*, 200 F.3d 978, 984 (6th Cir. 2000) (noting that it is "crucial" that occupants be given some opportunity to respond to the officers' demand for entry). The Court also

13

held, however, that suppression of evidence is not available for violations of this rule. *Id.* at 594. *See United States v. Smith*, 526 F.3d 306, 311 (6th Cir. 2008) (finding, under *Hudson*, the only remedy available for violations of the "knock and announce" rule was a civil action for damages under 42 U.S.C. § 1983, and not the suppression of evidence); *United States v. Snow*, 462 F.3d 55, 61 (2d Cir. 2006) (finding that "the strong medicine of suppression was inappropriate for an officer's failure to knock announce"); *United States v. Rivera*, 2009 U.S. Dist. LEXIS 75812, at *3 (N.D. Ohio Aug. 17, 2009) (same).

Still, the government maintains that agents did, indeed, comply with the rule. According to the government, "the agents did knock loudly on the front door, and did verbally announce their presence before entering. Cardenas, moreover, was afforded sufficient time to exit the garage and enter the residence before he was encountered

14

inside."[7] While the Court finds that the ruling in *Hudson* forecloses any further consideration of this issue, it notes that the credible evidence supports its finding that agents fully complied with the rule.[8]

### There was Valid Consent for the September 17, 2010 Search

According to the defendant, the owner of his leased property could not have consented to the September 17, 2010 search because the owner knew that the defendant had a one-year lease on the property. The government maintains that, shortly after the September 8, 2010 search, the defendant left the State of Ohio and advised the owner of the property that he did not intend to return. As such, the government argues that the defendant abandoned the property. In the alternative, the government argues that the agents performing the search had a good faith belief that the property had been abandoned.

Warrants are not required for searches and seizures of abandoned property. *See Abel v. United States*, 362 U.S. 217, 241 (1960) (Warrantless seizure of items abandoned in hotel wastepaper basket did not violate 4th Amendment--defendant had already checked out and "[t]here can be nothing unlawful in the Government's appropriation of […] abandoned property."). By voluntarily abandoning property, an individual forfeits any reasonable expectation of privacy in that property, *see United States v. Robinson*, 390 F.3d 853, 874 (6th Cir. 2004) (warrantless search of package valid because it was delivered to expired mailbox and unclaimed for 30 days), even if the

---

[7] Even assuming the "60 seconds" knock and announce advanced by the defendant, Sixth Circuit authority would find such a time period appropriate where the officers were executing a drug warrant. *See United States v. Miller*, 21 Fed. Appx. 397, 401 (6th Cir. 2001) ("There is substantial precedent, both in this circuit and others, for the proposition that a wait of no more than fifteen seconds between announcement and entry may be sufficient when a drug search warrant is executed.") (collecting cases).

individual retains an ownership interest in it. *United States v. Thomas*, 864 F.2d 843, 846 (D.C. Cir. 1989) (reasonable expectation of privacy relinquished when defendant left gym bag in public hallway because property deemed abandoned regardless of defendant's continued ownership interest and intent to retrieve it later).

While the defendant may have signed a one-year lease on September 1, 2010, the Court finds that the record evidence establishes that, immediately following the September 8, 2010 search by law enforcement, the defendant left the premises without the intent to return, and that he asked the landlord to forward his belongings. This constitutes abandonment. *See, e.g., United States v. Stevenson*, 396 F.3d 538, 542-47 (4th Cir. 2005) (defendant abandoned any reasonable expectation of privacy in apartment when he wrote his girlfriend and advised her that he no longer considered himself to be a resident of the apartment and gave her his personal belongings). Further, the Court credits Special Agent McBride's testimony that he had no reason to disbelieve Mr. Toro's account as he appeared to be an upfront and honest person. Consequently, the Court finds that, at the very least, the agents had a good faith belief that the defendant had abandoned the property when they searched it on September 17, 2010. As such, there was legal justification for this warrantless search.

Scope of the Warrant

The defendant also complains that officers exceeded the scope of the September 8, 2010 search warrant when they seized certain items that were not specifically identified in the warrant. The government notes that the defendant relies heavily upon items that were actually seized during the September 17, 2011 search.

---

[8] The Court notes that all of the authority cited by the defendant pre-dates the *Hudson* decision.

Obviously, the seizure of these items would not be restricted by the September 8, 2011 search warrant. It further notes that it does not intend to offer certain items taken on September 8, 2011 (N-77, N-85, N-88 [laptop], and N-89 [key]), making the issue moot as to these items.

It does, however, intend to offer certain items taken during the September 8, 2011 search, including: various articles of clothing, a food saver (vacuum sealer), and food saver bags. While acknowledging that these items were not particularly described in the search warrant, the government maintains that these items were properly seized pursuant to the plain view doctrine.

In order to establish a right to seize items without a search warrant and pursuant to the plain view doctrine, the police must not "violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990). As such, the officers must be lawfully on the premises at the time the items are observed. *See United States v. Blair*, 214 F.3d 690, 698 (6th Cir. 2000) (officer's presence where drugs found in plain view justified by search warrant). Second, the incriminating character of the evidence seized must be "immediately apparent." *See Horton*, 496 U.S. at 136-37. The incriminating nature of an object is immediately apparent if the police have probable cause to believe that an object in plain view is contraband. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). The plain view standard "does not demand an 'unduly high degree of certainty' but is satisfied instead if 'there is probable cause to associate the property with criminal activity.'" *United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir. 1997) (internal citation omitted).

17

The officers were present at the defendant's residence pursuant to a valid search warrant, and the defendant does not challenge this point. Further, Special Agents Moses and McBride testified credibly that the items were all found in areas on the premises where drugs could have been concealed. The Court also credits the agents' testimony that officers on the scene immediately recognized the "incriminating nature" of the clothing as clothing identical to that which the defendant and co-defendant Felix wore when they were surveilled visiting co-conspirator Decola's residence engaging in what officers believed was drug trafficking activity. (*See* Gov. Ex. 8A-9D, and Gov. Ex. 10A-10E, photographs depicting the items of clothing confiscated.) The Court likewise credits agent testimony that the incriminating nature of the vacuum sealer and plastic bags was immediately apparent, as such items are often used in the packaging and transportation of drugs and drug proceeds. Because the items in question were properly seized in plain view during a valid search of the residence, agents did not illegally exceed the boundaries of the search warrant, and suppression is not required.

**Conclusion**

For all of the foregoing reasons, the Court denies the defendant's motion to suppress in its entirety.

**IT IS SO ORDERED**.

Dated: September 21, 2010

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**